**MICHELLE BETANCOURT**
California Bar No. 215035
**HANNI M. FAKHOURY**
California Bar No. 252629
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California  92101-5008
Telephone:  (619) 234-8467
Hanni_Fakhoury@fd.org

Attorneys for Mr. Snow

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JANIS L. SAMMARTINO)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.: 09CR2195-JLS |
| ) | |
| Plaintiff, ) | |
| ) | STATEMENT OF FACTS AND |
| v. ) | MEMORANDUM OF POINTS AND |
| ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| **BRENT SNOW**, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**I.**

**STATEMENT OF FACTS**[1]

**A.    Background**

In November 2008, an unknown man was arrested at the San Ysidro port of entry, attempting to smuggle 300 kilograms of marijuana into the United States. As a result of the arrest, this individual became a confidential informant (hereinafter "CI") for the government.

On April 27, 2009, ICE Special Agents Hart and Hardesty came across a boat parked on Sandpiper Way in Chula Vista, California. Agent Hart claimed he recognized the boat because the CI had told him that boat was used to smuggle marijuana into the United States. Agent Hart called ICE Special Agent Levan, who met the agents at the boat in Chula Vista. Agent Levan called the CI and received permission from the CI

---

[1.] The facts are taken from the discovery provided by the government. Mr. Snow does not stipulate to its accuracy and reserves the right to challenge it at future proceedings.

to board the boat and search it. After 40 minutes, the agents ultimately found a compartment in the boat that contained one brick of marijuana weighing 5 pounds. The agents placed a tracking device within the boat but did not seize the boat. Nothing in the discovery provided by the government to Mr. Snow demonstrates that the CI was the registered owner of the boat or had any possessory interest in the boat.

A few days later, on April 30, 2009, the agents drove to Sandpiper Way and the specific location where the boat had been parked but noticed that neither the boat nor the trailer were at that location anymore. Agent Levan then asked Agent Hart to turn on the electronic tracking device placed on the boat and found that the boat had been moved to a pay parking lot on Roll Drive in Otay Mesa. Agent Levan traveled to the parking lot and found the boat and trailer parked in the rear parking lot. No people were around the boat.

On May 4, 2009, Agent Levan returned to the parking lot in Otay Mesa and found two men attaching the boat and trailer to a white Ford F-150 pickup truck. Computer checks revealed that the F-150 had crossed into the United States from Mexico earlier that morning. The two men were identified as co-defendant Apolinar Villareal and Alberto Villareal. Agent Levan requested other ICE agents follow the truck, trailer and boat. They observed the truck tow the boat out of the Otay Mesa parking lot and into a parking lot near the San Ysidro port of entry. The two men unhitched the boat and trailer and left in the truck for approximately an hour and a half. They later returned to the boat, hitched it to the truck and crossed from the United States into Mexico.

**B.    May 8, 2009 Surveillance of the F-150**

On May 8, 2009, ICE agents followed the white F-150 as it entered into the United States from Mexico hauling an empty boat trailer. Agent Levan identified Apolinar Villareal as the driver of the truck. The agents followed the truck to a parking lot in San Ysidro and witnessed Apolinar Villareal leave the boat trailer at the parking lot and then proceed to drive in the truck to the Palomar Street Trolley Station in Chula Vista. There, the agents observed Apolinar Villareal leave the truck and get into a gold Lexus sedan driven by a man the agent knew as "Flako," whom they suspected was involved in drug trafficking. "Flako" and Mr. Villareal drove in the Lexus to the De Anza cove boat ramp in Mission Bay, California. There, they noticed "Flako" and Mr. Villareal walk around the Dana landing boat ramp. While agents followed the Lexus, other agents placed a tracking device on the underside of the F-150. Approximately one hour later, "Flako" and

//

Mr. Villareal left the boat ramp, and returned to the trolley station, where Mr. Villareal got in his F-150 and crossed through the San Ysidro port of entry into Mexico.

**C.    May 9, 2009 Search of the Boat**

At approximately 12:15 p.m., agents checked the tracking device on the F-150 and noted that it had crossed the border at the San Ysidro port of entry and was at the border station pay parking lot in San Ysidro. Two hours later, CBP Marine Interdiction agents spotted the boat entering Mission Bay from the south. The agents followed the boat and saw two men in the boat, later identified as defendant Brent Snow - who was driving the boat - and Stephen Kalasz. The boat entered Mission Bay and the agents observed the boat stop, and the two occupants start fishing. At approximately 2:45 p.m., the boat began moving towards the Dana landing boat ramp.

Meanwhile, agent surveilled the F-150 enter the Dana landing boat ramp at approximately 2:50 p.m. The truck was hauling an empty trailer. Following the F-150 was a maroon Kia. Apolinar Villareal was identified as the driver of the F-150 and Alberto Villareal was identified as the driver of the Kia. The agents observed Mr. Snow and Apolinar Villareal attempt to winch the boat onto the trailer. Once the boat was taken out of the water and attached to the trailer, the agents saw Mr. Snow take two black duffel bags and hand them to Apolinar Villareal, who placed them into the bed of the F-150. Mr. Snow and Mr. Kalasz then got into the passenger side of the F-150 and, hauling the boat, left the parking lot and ultimately got onto the freeway. The Kia was following the F-150 the entire time. Agents saw the F-150 ultimately drive to a parking lot in  San Diego.

At the parking lot, Mr. Snow, Mr. Kalasz and Apolinar Villareal got out of the F-150 and entered the Kia, leaving the truck, boat and trailer in the parking lot. Mr. Snow and Mr. Kalasz eventually went into Room 103 of the motel. The Kia ultimately drove to the Classic Inn in San Ysidro and left Mr. Snow and Mr. Kalasz at the Inn, then returned to the parking lot. At the Inn, Apolinar Villareal handed the duffel bags to Mr. Snow, who then took them with him into his room. The ICE Agents maintained surveillance on all four men during this entire time. When the Kia returned to the parking lot, it parked next to the F-150. As Apolinar and Alberto Villareal were getting out of the Kia, the ICE agents approached and detained them. Without a warrant or the consent of either Apolinar or Alberto Villareal, the agents then searched the boat and ultimately found 567 kilograms of marijuana. After placing Apolinar and Alberto Villareal under arrest,

the agents also searched the center console and glove box of the truck without a warrant or consent. They also searched a backpack found in the rear of the F-150.

**D.     Arrest of Mr. Snow**

Once the marijuana had been found, the ICE agents that remained at the Classic Inn went to the room where Mr. Snow and Mr. Kalasz had checked in, detained them and transported them to the San Ysidro port of entry for questioning. Both Mr. Snow and Mr. Kalasz invoked their constitutional right to have an attorney present. Mr. Kalasz was released from ICE custody while Mr. Snow was placed under arrest for importation of marijuana, in violation of 21 U.S.C. §§ 952 and 960, and aiding and abetting under 18 U.S.C. § 2. The agents also searched the duffel bags and the hotel room without a warrant or consent.

**E.     The Indictment**

On June 8, 2009 a two count indictment was handed down charging Mr. Snow with importation of marijuana, in violation of 21 U.S.C. §§ 952 and 960, and possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841.

**II.**

**THE STOP OF THE TRUCK WAS NOT BASED ON A REASONABLE ARTICULABLE SUSPICION OF CRIMINAL ACTIVITY AND THEREFORE ALL EVIDENCE SEIZED MUST BE SUPPRESSED**

The Fourth Amendment protects the "right of people to be secure in their persons, houses papers, and effects, against unreasonable searches and seizures." The Fourth Amendment specifically prohibits unreasonable searches and seizures of a vehicle during brief investigatory stops. See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). An officer may detain a motorist only upon a demonstration of "reasonable suspicion" of criminal activity. See United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Rodriguez, 976 F.2d 592, 594 (9th Cir. 1992), amended 997 F.2d 1306 (9th Cir. 1993) (stating that an officer may not detain a motorist without a showing of a "particularized and objective basis for suspecting the particular person stopped of criminal activity" (quoting Cortez, 449 U.S. at 417-18)).

Although Mr. Snow was only a passenger of the truck, he does have standing to challenge "the legality of his own detention" as a passenger in the car. United States v. Pulliam, 405 F.3d 782, 787 (9th Cir. 2005) (quoting United States v. Nava-Ramirez, 269 F.3d 1128, 1132 (10th Cir. 2001).

//

**A.    The Agents Did Not Have A Reasonable Articulable Suspicion That Criminal Activity Was Afoot To Stop the Truck.**

The government bears the burden of establishing that the totality of the circumstances attendant to a investigatory stop gave the agents reasonable suspicion that criminal activity was afoot. United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1121 (9th Cir. 2002). In determining whether there was reasonable suspicion the Court "must look at the 'totality of the circumstances' of the case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.'" Id. (quoting United States v. Arvizu, 534 U.S. 266 (2002)). "[R]easonable suspicion may not be 'based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'" Sigmond-Ballesteros, 285 F.3d at 1121. (quoting United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir. 1994), overruled in part on other grounds by United States v. Montero-Camargo, 208 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc), cert. denied sub nom. Sanchez-Guillen v. United States, 531 U.S. 889 (2000).

A determination of whether an officer had "reasonable suspicion" of wrongdoing is "'not readily, or even usefully, reduced to a neat set of legal rules.'" Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)); see also United States v. Hernandez-Alvarado, 891 F.2d 1414, 1416 (9th Cir. 1989). Rather, in making reasonable-suspicion determinations, the court must consider the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting criminal activity. United States v. Cortez, 449 U.S. 411, 418 (1981); see also United States v. Arvizu, 534 US. 266 (2002) (holding that the "totality of the circumstances" inquiry of an investigatory stop of a vehicle must be based on all factors, collectively, and not each in isolation). While this inquiry "includes the 'collective knowledge of the officers involved, and inferences reached by experienced, trained officers,'" Hall, 974 F.2d at 1204 (other internal quotations omitted), this experience may *not* be used to give the officers unbridled discretion in making a stop. See Hernandez-Alvarado, 891 F.2d at 1416.

The Supreme Court has cautioned that an "anonymous tip lacking indicia of reliability" cannot be the sole basis for an investigatory stop. Florida v. J.L., 529 U.S. 266, 273 (2000). Furthermore the Ninth Circuit has cautioned courts not to accept "a prefabricated or recycled profile of suspicious behavior very

likely to sweep many ordinary citizens into a generality of suspicious appearance merely on a hunch." Sigmond-Ballesteros, 285 F.3d at 1126.

Here the agents did not have reasonable articulable suspicion that criminal activity was occurring before stopping the truck on May 9, 2009. At that time all the agents observed was that the truck had crossed into Mexico on May 4, 2009 and had reentered into the United States on May 8, 2009. The agents had information that Mr. Villareal had met with "Flako" but observed the two men engaging in no illegal activity. Furthermore, although drugs had previously been found in the boat towed by the truck, the truck was not present with the boat when drugs were found in April 2009 and the agents had no information about who had control or access to the truck or boat in that time frame. These bare facts could not give rise to a reasonable articulable suspicion on May 9, 2009 that criminal activity was occurring. Therefore, the stop of the truck on May 9 was unreasonable and all the fruits of the search, including the items seized from the truck, must be suppressed. Wong Sun v. United States, 371 U.S. 471, 488 (1963).

**B.    Even If the Agents Did Have Reasonable Articulable Suspicion to Stop the Truck, the Warrantless Search of the Containers Within The Truck Was Unreasonable.**

Officers may search a car and containers therein incident to a lawful arrest of the occupants of the car. New York v. Belton, 453 U.S. 454, 460 (1981). However, the Supreme Court recently held a search of a car incident to arrest of an occupant is reasonable only if "the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 129 S.Ct. 1710, 1723 (2009).

The warrantless search of the cab after the arrest of Mr. Villareal of the F-150 was unreasonable. Based on the government's discovery, at the time Mr. Villareal was arrested, he had stepped out of the Kia - not the truck - and was not "within reaching distance of the passenger compartment at the time of the search." Gant, 129 S.Ct. at 1723. He had previously parked the truck and presumably had locked it. The truck's door was closed and he was not inside the cab of the truck or in the passenger compartment at all. Therefore, the agents could not rely on "search incident to arrest" exception to the warrant requirement. Therefore, the warrantless search of the truck's interior was unreasonable and all the fruits seized thereof must be suppressed.

**III.**

**THE SEARCH OF THE BOAT VIOLATED MR. SNOW'S FOURTH AMENDMENT RIGHTS AND THEREFORE ALL EVIDENCE SEIZED MUST BE SUPPRESSED**

The Fourth Amendment protects the "right of people to be secure in their persons, houses papers, and effects, against unreasonable searches and seizures." U.S. Constitution Amend. IV. A warrantless search is per se unreasonable unless it falls within an established exception to the warrant requirement. Katz v. United States, 389 U.S. 347, 357 (1967). Here, there were two warrantless searches of the boat that violated the Fourth Amendment. Each will be dealt with in turn.

**A.     April 27, 2009 Search of the Boat**

The Fourth Amendment permits warrantless searches in "which voluntary consent has been obtained, either from the individual whose property is searched" or "from a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (citations omitted). The burden is on the government to demonstrate that the consenting person actually has "common authority" over the property searched. Id.

Here, the government can point to no evidence whatsoever that the CI who gave Agent Levan consent to search actually had "common authority" over the boat to voluntarily consent to its search. The discovery provided by the government shows no registration for the boat or the identity of the CI. Without any proffer by the government that the CI actually had "common authority" over the boat, the search of the boat was unreasonable. Furthermore, even if the government can demonstrate the CI had "common authority" over the boat, it is unlikely that the consent was given "voluntarily" since he had previously been arrested and was cooperating with the agents. He likely felt he had no choice but to tell the agents that they could search the boat. Therefore, the search of the boat on April 27, 2009 was unreasonable and the fruits of the search must be suppressed.

**B.     May 9, 2009 Search of the Boat**

Under the "automobile" exception, officers may search a moving vessel and its contents without a warrant only if the officers have probable cause to believe they may find evidence of a crime in the vessel. United States v. Ross, 456 U.S. 798, 825 (1982); Carroll v. United States, 267 U.S. 132, 153 (1925) (covering searches of "a ship, motor boat, wagon or automobile"); United States v. Kaiyo Maru No. 53, 699

F.2d 989, 998 (9th Cir. 1983) ("The Carroll exception extends to vessels as well as automobiles and other movable vehicles. . ."). "Probable cause" means "a fair probability that ... evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

Here, the agents did not have "probable cause" to believe there would be contraband contained in the vessel to permit them to search the boat without a warrant. The only reason the agents could articulate as to why they believed the boat may have contained contraband was the search of the boat on April 27, 2009, which resulted in the seizure of the smaller brick of marijuana. Yet this information was "stale." The Ninth Circuit has held that when an officer has "*fresh*, direct, uncontradicted evidence" probable cause exists to search a car without a warrant for evidence of a crime. United States v. Vasquez, 858 F.3d 1387, 1391 (9th Cir. 1988), cert denied, 488 U.S. 1034 (1989) (quoting California v. Carney, 471 U.S. 386, 395 (1985) (emphasis added)). But when the information known by law enforcement is old or stale, the Ninth Circuit has found that probable cause does not exist. See United States v. Perez, 67 F.3d 1371, 1376 (9th Cir. 1995), overruled on other grounds, 116 F.3d 840 (finding no probable cause existed when agents searched car four days after criminal activity occurred). The ICE agents did not have "fresh" information to search the boat. Drugs had been found in the boat more than 10 days before the agents boarded and searched the boat. The CI had not provided any information to the officers that drugs were going to be smuggled into the United States in the days leading up to May 9, 2009. Therefore, they did not have probable cause to search the boat.

The government may attempt to argue that the search of the boat did not implicate the Fourth Amendment under the "border search doctrine." Yet that argument lacks merit. Under the "border search doctrine," the government may search vessels without a warrant or probable cause at the "functional equivalent of the border, but only if its agents are reasonably certain that a vessel and its contraband contents have crossed the border." United States v. Bennett, 363 F.3d 947, 950 (9th Cir. 2004) (citing United States v. Dobson, 781 F.2d 1374, 1376 (9th Cir.1986). The Ninth Circuit has explained that the "'reasonably certain' standard is higher than a probable cause standard." Bennett, 363 F.3d at 950 (citing United States v. Kessler, 497 F.2d 277, 279 (9th Cir.1974)).

Here, it was not "reasonably certain" that the boat crossed the international border recently to permit the officers to rely on the border search doctrine. Although the Ninth Circuit has never described how soon after crossing the border officers may rely on the border search doctrine to conduct a warrantless search of

a vessel believed to have crossed the border, there must be some limits to the government's ability to conduct a warrantless search at the border. The Supreme Court recently explained in <u>United States v. Flores-Montano</u>, 541 U.S. 149, 155-156 (2004) that some searches at the border may be unreasonable if property is severely damaged. Additionally, in <u>United States v. Seljan</u>, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc), the Ninth Circuit declined to follow the government's position "that, at the border, anything goes." Clearly, then, there are limits to the government's ability to conduct a warrantless search at the border.

Furthermore, the cases upholding the border search doctrine to the search of boats demonstrate a close temporal proximity from the time the vessel crossed the border to the time the agents searched it without a warrant. In <u>Bennett</u>, the agents began surveiling a boat at Imperial Beach, just north of the border between Mexico and the United States. <u>Bennett</u>, 363 F.3d at 949-950. They followed the boat with binoculars and noticed it was "hugging the coastline" and heading north. <u>Id.</u> It eventually stopped the boat near Coronado Island, approximately 10 miles north of the international border. <u>Id.</u> Under these circumstances, the border search doctrine applied. <u>Id.</u> at 950-951. In <u>Dobson</u>, agents had received information to follow a boat that may contain marijuana. 781 F.2d at 1375. A coast guard helicopter noticed the boat in international waters on November 21, 1984. <u>Id.</u> The next day, less than 24 hours after being spotted in international waters, it was observed in domestic waters and stopped by coast guard officers. <u>Id.</u> The Ninth Circuit held that the border search doctrine applied in that case as well. <u>Id.</u> at 1377.

Here, however, the agents were aware that the boat had crossed the border into Mexico on May 4, 2009. They spotted it in Mission Bay five days later, May 9, 2009, is Mission Bay, approximately 20 miles north of the international border with Mexico. Unlike the boat in <u>Bennett</u>, the agents did not observe it anywhere near the border or hugging the coastline. <u>Bennett</u>, 363 F.3d at 949-951. Unlike the boat in <u>Dobson</u>, the agents had no information whether it crossed the international border within 24 hours. While the agents knew that the boat had crossed the international border *sometime* between May 5 and May 9, they could not be "reasonably certain" when. Without a more specific time frame as to when the boat crossed the border, the agents could not rely on the border search doctrine to conduct a warrantless search of the boat.

Unable to rely probable cause to believe there was contraband in the boat or the border search doctrine, the warrantless search of the boat was unreasonable and thus unconstitutional. Therefore, any and

//

all evidence seized as a result of the unlawful arrest must be suppressed as "fruit of the poisonous tree." Wong Sun, 371 U.S. at 488.

### IV.

### THE AGENTS DID NOT HAVE PROBABLE CAUSE TO ARREST MR. SNOW AND THEREFORE ANY FRUITS OF THIS UNLAWFUL SEIZURE MUST BE SUPPRESSED

The Fourth Amendment requires law enforcement have probable cause before making a warrantless arrest. Michigan v. Summers, 452 U.S. 692, 700 (1981). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). "Mere suspicion" or even a "strong reason to suspect" are not enough to support a warrantless arrest. Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009) (citing Henry v. United States, 361 U.S. 98, 101 (1959)).

**A.     There Was No Probable Cause To Suspect Mr. Snow Had Committed A Crime.**

Here the agents did not have probable cause to believe Mr. Snow had committed a crime. All the agents had was their knowledge that Mr. Snow was driving the boat, later found to contain marijuana concealed throughout. They did not see him get in the boat, did not see him near or around the compartment, did not see him take possession of the boat, did not know where or when he got in the boat. In short, the agents did not see Mr. Snow do anything other than drive the boat, stop in Mission Bay and go fishing. Even if they had a "strong reason to suspect" Mr. Snow had committed a crime, that was not enough to arrest him without a warrant. Ramirez, 560 F.3d at 1023. Therefore, all the fruits of the illegal arrest - including all of the personal items seized - must be suppressed.

**B.     Even If this Court Finds That the Warrantless Arrest of Mr. Snow Did Not Violate the Fourth Amendment, the Search of His Personal Belongings in His Hotel Room Was Unreasonable and the Fruits Seized Must Be Suppressed.**

If the Court finds the arrest of Mr. Snow was proper under the Fourth Amendment, the search of his duffel bags and personal belongings in the hotel room violated the Fourth Amendment. The Fourth Amendment extends to places such "as hotel or motel rooms." United States v. Cormier, 220 F.3d 1103, 1108-09 (9th Cir.2000). As the Ninth Circuit explained last week in United States v. Young, 2009 WL 2020126 at *4 (9th Cir. July 14, 2009), "a hotel guest does not lose his reasonable expectation of privacy

in his hotel room just because he is detained or arrested by a police officer" outside of his room. Therefore, the officers must have had a warrant.

Without a warrant, they could only rely on an exception to the warrant requirement. As argued above with respect to the truck, the search of the belongings in the hotel room could not be justified as a search incident to arrest because the items were not in Mr. Snow's "immediate control." Gant, 129 S.Ct. at 1716 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)). A search incident to arrest is justified by the interest in "officer safety and evidence preservation." Gant, 129 S.Ct. at 1716. When "there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." Id. (citing Preston v. United States, 376 U.S. 364, 367-368 (1964)). Here, once the agents had taken Mr. Snow and Mr. Kalasz into custody, the justifications for a search incident to arrest no longer existed and the agents needed a warrant. Since they had no warrant, any search of the duffel bags was unreasonable and therefore must be suppressed.

### V.

### THIS COURT SHOULD CONDUCT AN EVIDENTIARY HEARING TO DETERMINE WHETHER MR. SNOW'S FOURTH AMENDMENT RIGHTS WERE VIOLATED

Because Mr. Snow's motion to suppress evidence necessitates this Court to make a factual determination, an evidentiary hearing is necessary to resolve the issues. Where a factual determination is required, Rule 12 of the Federal Rules of Criminal Procedure obligates courts to make factual findings. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading. Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)). Therefore this Court should hold an evidentiary hearing.

### VI.

### CONCLUSION

The agents had ample opportunity to obtain a warrant. The Ninth Circuit has repeatedly held that "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." Young, 2009 WL 2020126 at *11 (quoting United States v. Echegoyen, 799 F.2d 1271, 1280 n. 7 (9th Cir.

1986). For this reason, as well as the reasons stated above, Mr. Snow respectfully requests that this Court conduct an evidentiary hearing and rant the motions to suppress.

                                        Respectfully submitted,

Dated: July 22, 2009                     *s/ Hanni M. Fakhoury*
                                           **HANNI M. FAKHOURY**
                                           Federal Defenders of San Diego, Inc.
                                           Attorneys for Mr. Snow